2484.  QUEEN INSURANCE COMPANY OF AMERICA *v.* HARTWELL ICE & LAUNDRY COMPANY.

1. A made a verbal application to a local agent of an insurance company for a policy of insurance on certain described property, then offering to pay the premium to the agent. The agent stated that he could not at that time issue the regular standard policy of the company, nor accept the tender of the premium, because he did not know the rate on that class of property. The agent agreed, however, to enter upon the books of the company a written memorandum in the nature of a "binder," which he stated would be effective as a contract of insurance until the regular policy was issued by the company, and that on receipt of this regular policy A could pay the premium. This was satisfactory to A, and the agent, in compliance with his agreement, did write, sign, and place in the book of policies issued by the company at his agency a statement or "binder," containing all the essential elements of a contract of insurance between A and the company, and made a written report to the company of this memorandum or "binder," and of his acts relating to the same; all of which was affirmed and ratified by the company. *Held:* (a) A complete temporary contract of insurance existed between A and the insurance company during the period set out in the memorandum or "binder." (b) For a loss which occurred during the existence of

the temporary contract, and before the rate of premium had been fixed on the property covered thereby, A could recover the amount stipulated as indemnity in the "binder," less the rate of premium fixed by the company subsequently to the loss.

2. The property described in the memorandum or "binder" was insured during the term specified therein upon the terms and conditions of the regular standard policy of the company, and a breach of any of these terms and conditions that would render void the regular policy would also make void the temporary contract, and any waiver of such breaches would apply to the latter. Whether there was a waiver by the insurance company of breaches of the terms of the policy relating to other concurrent insurance, and to incumbrance on the property, and proofs of loss, and what would be a reasonable time within which to submit proofs of loss, were issues of fact for the jury, under the evidence; and where the law pertinent to the issues has been fully and correctly charged, as in this case, this court can not, as to them, interfere with a verdict supported by any evidence.

Action upon insurance policy; from city court of Hartwell— Judge Pendleton presiding.

On August 27, 1908, Linder, as president of the Hartwell Ice & Laundry Company, made a verbal application to Matheson, agent of the Queen Insurance Company, located at Hartwell, for a policy of insurance of $2,000 on the plant and machinery of the company. Matheson then informed Linder that he could not at that time issue a regular policy, because he did not know the proper rate of premium, but that he would make a memorandum on the books of the insurance company kept by him, of a "binder," and that the insurance would go into effect from that date. Linder then offered to pay the premium, but Matheson refused to accept it, stating that he did not know the rate, but that immediately upon receipt of the rate he would notify him, when the regular standard policy would be issued. In pursuance of his agreement and promise, Matheson on the same day made the following pencil memorandum on a sheet of paper: "Queen, $2,000, on Hartwell Ice Plant Machinery from August 27th, 1908, to August 27th, 1909. R. E. Matheson, agent. Policy to be issued when new rate is received." The sheet on which this memorandum was written was put in the book of the Queen Insurance Company's policies, kept by Matheson as agent. Subsequently Matheson pinned this sheet on page 95 of this book, numbering it 123, in a place in the book reserved for the regular standard policy when issued, the regular policy to be numbered 123. On the day when the "binder" was made and put

in his book of the Queen Insurance Company's policies, he wrote to the manager of the insurance company in Atlanta, Ga., as follows: "I have accepted a $2,000 risk on the Hartwell Ice Plant, and will send daily report as soon as rate is fixed on same, which I think will be within a few days." Matheson testified that it was his custom as agent of the Queen Insurance Company, where applications were made to him for policies of insurance, to make memoranda similar to that made in the present case, and that these memoranda, or "slips," were known among insurance companies as "binders;" that he did not know what the rate on this policy was until after the fire. The standard policy of the company was not issued, and on September 10 the property covered by the alleged contract was entirely consumed by fire. On September 11 Linder notified the manager of the company in Atlanta of the loss, and on the same day Matheson wired the manager as follows: "Hartwell Ice Plant totally destroyed by fire. $2,000 loss for the Queen." On the same day, in reply, the assistant manager of the company wrote to Matheson: "We have your telegram advising of total loss of $2,000 under binder issued August 27th on this risk. I now beg to confirm our conversation over the phone this morning, requesting you to reserve policy 121 to be issued covering this risk on arrival of our special agent or adjuster." In reply, on the next day, Matheson wrote to the assistant manager: "Your letter acknowledging receipt of my telegram in regard to the loss by fire of Hartwell Ice Plant received. You request me to reserve policy number 121 for the above, but I issued this number to Liquid Carbonate Company; so have reserved number 122 instead. I enclose daily report of same." The daily report referred to was on the regular form used by the agents of the company, the following being the material parts "Queen Insurance Company of America: Name of the insured, Hartwell Ice & Laundry Company. Amount of insurance, $2,000. Present rate, 5%, premium $100. Commencement of risk, August 27th, 1908; term 1 year. Expiration of risk, August 27th, 1909. [Signed] Hartwell Georgia Agency." On September 18, Matheson again wrote to the manager in Atlanta: "I wrote you that I had reserved number 122 for the Hartwell Ice Company, but I unfortunately issued this to another party. So have reserved number 123 for the Hartwell Company."

Matheson represented the Queen Insurance Company at Hart-

well, Ga., under this commission: "Power to receive proposals for insurance against loss and damage by fire at Hartwell, Georgia, and vicinity, to fix rates of premiums, to receive moneys, countersign, issue, renew, and consent to transfer of policies of insurance signed by the manager at Atlanta, Georgia, of the Queen Insurance Company of America, subject to the rules and regulations of the said company, and to such instructions as may from time to time be given by said manager, which authority may be revoked at any time." It was admitted that at the time when the application for insurance was made by Linder to Matheson and when the property was destroyed by fire, there was other insurance, of $1,000, on the property, and that there was an outstanding mortgage of $500 on the property. Linder testified that he specifically informed Matheson of the existence of the other insurance and of the existence of the mortgage, when he made the application for the policy. Matheson testified that when he wrote the pencil memorandum or "binder," and "slipped it in the book of the Queen Insurance Company," he knew nothing of the existence of the other insurance or the mortgage; that Linder did not disclose their existence to him when he made the application for the insurance, and did not tell him of their existence until several days after he made the application and after the alleged binding memorandum had been made by him. The regular standard form of policy which was to be issued by the company contains a condition that the policy will be void if there is other concurrent insurance without the written consent of the company, or if the insured is not the sole and unconditional owner of the property insured, or if there is any outstanding incumbrance on the property. It is also admitted that no proofs of loss were ever submitted to the company, as required by the standard policy. The plaintiff claimed that this condition of the policy had been waived by an unconditional and absolute denial of liability by the company and a refusal to pay the loss. This denial was contained in a letter to the plaintiff, written by King & Spalding, attorneys for the company, dated March 6, 1908. The foregoing is a statement of all the material and pertinent evidence illustrative of the issues in the case.

Plaintiff based its suit on the written memorandum or "binder," alleging that it constituted a valid contract of insurance. Defendant denied the existence of a valid contract of insurance, and

contended that even if the evidence proved a binding contract, it had been breached by the plaintiff, because of the concealment of the fact of other concurrent insurance and the incumbrance on the property, and because of a failure to submit due proof of loss. Plaintiff in reply set up a waiver of all these conditions and terms of the policy.   The trial judge construed the writings as constituting a valid contract of insurance, and submitted to the jury the issues made by the evidence as to the alleged waivers by the defendant of the admitted breaches of the terms of the contract above mentioned.   The jury found a verdict for the plaintiff, for $1,900,—the amount of the contract, less $100 as premium,—and the defendant's motion for a new trial was overruled.   The contentions of the parties, indicated by the above statement, will be more specifically set out and discussed in the course of the opinion.

*King & Spalding, E. Marvin Underwood, Julian B. McCurry,* for plaintiff in error.   *T. W. Rucker, A. G. McCurry,* contra.

HILL, C. J.   (After stating the foregoing facts.)

1.   It is manifest that Linder, as president of the Hartwell Ice & Laundry Company, and Matheson, as agent of the Queen Insurance Company, intended to make a binding contract of insurance. It was in the contemplation of both parties that the memorandum made by Matheson, in accordance with his custom, called a "binder," should constitute an effective and complete contract of insurance between the insurer and the insured, and that the duration of the contract thus created, first by the temporary "binder," and continued by the regular policy, should be for one year from August 27, 1908.   It is equally manifest that the insurance company, with full knowledge of all the facts, confirmed and approved the temporary contract, as evidenced by the "binder" made by its agent, and, both prior and subsequent to the fire, treated it as valid.   If the temporary contract lacked any of the essential elements of a valid contract of insurance, it was due entirely to the agent of the insurance company; and if in fact any incompleteness existed in this temporary contract, it was fully known to the insurance company, which, nevertheless, recognized the binding effect of the temporary contract.   These facts clearly appearing, the contract should be upheld, unless it contravenes some law of this State, or is too imperfect and incomplete to be enforced.   It is insisted that the statute of this State requires that the whole con-

tract of insurance shall be in writing, and shall be signed by the insurer, and that the written memorandum or "binder," relied upon as a contract, is incomplete, in that several elements necessary to make a contract of insurance are omitted therefrom.    The memorandum in question, it is contended, does not sufficiently describe the parties thereto, it not showing, (1) who the insured is; (2) nor the insurer, unless the insurer is R. E. Matheson, individually, the word "agent" being merely descriptio personæ; (3) nor is the premium to be paid agreed upon, nor any promise moving from either party disclosed.    Of course, there can be no contract without parties, and the contract should identify the parties. It should not be lost sight of in this case that the plaintiff, while setting up the memorandum made by the agent as creating the contract, relies upon other contemporaneous and subsequent writings as evidence of the contract.    The evidence shows "a series of writings internally connected one with another, executed contemporaneously with or subsequently to" the written memorandum, which are intelligible without parol and which clearly prove the contract relied upon.    *Capital City Brick Co.* v. *Atlanta Ice & Coal Co.,* 5 *Ga. App.* 436 (63 S. E. 562).    Construing together all the writings on the same subject-matter, every essential element of a complete contract of insurance appears; and the written report of the temporary contract made by the agent to the manager of the company omits no essential element of a complete contract of insurance.    *Todd* v. *German-American Insurance Co.,* 2 *Ga. App.* 789 (59 S. E. 94).    But even if the memorandum made by the agent and called in insurance parlance a "binder" stood alone, we do not think it lacks any essential element of a contract of insurance.    According to Mr. Joyce in his work on insurance (1 Joyce on Insurance, §46), temporary insurance contracts evidenced by "binders" need not contain all the terms and conditions of a permanent contract, as where the terms of the usual policy are presumed to be intended, or where the usual rate of premium is presumed to be meant; and this statement of the law is expressly approved by this court in the *Todd* case, supra.    But the "binder" now under discussion left nothing uncertain, except the amount of the rate of premium, and it shows an agreement to pay the rate of premium as fixed by the company and when the regular policy should issue and be received by the insured.    Any uncer-

tainty as to the rate of premium was due solely to the action of the agent of the defendant and of the defendant itself. While the "binder" does not show any specific premium to be paid, it does show by necessary implication an agreement to pay whatever rate of premium might be fixed by the company, and when the permanent policy was issued and delivered to the insured. The insurer in this case, by the very terms of the "binder," postponed the payment of the premium by the insured until the temporary contract was ended by the substitution of the regular standard policy. The fact that credit is given for the payment of a premium in no wise invalidates the contract of insurance. 1 Cooley's Briefs on the Law of Insurance, 375. Suppose in this case the memorandum or "binder" had been delivered to the insured, instead of having been kept by the agent and made a part of the records of the company in his office, would not the insured have been legally liable, in accepting the "binder," to pay whatever rate of premium was subsequently fixed on the property covered by the contract? And if the insurance company had failed to fix the rate of premium before the loss occurred, would not the insured have been bound to pay a reasonable rate for the protection which he received by the temporary contract, or, under the facts of this case, the rate as subsequently fixed on similar property? But in this case the insured, when he made the application for the insurance, offered to pay the premium, which was refused by the agent of the company because the rate had not at that time been fixed. It seems to us that to hold that this contract was invalid or incomplete because there was no specific rate of premium mentioned in the "binder," under the uncontroverted evidence, would be a gross injustice to the insured. A case very much in point is that of Smith v. Prussian Insurance Co., 68 N. J. L. 674 (54 Atl. 458). In that case an insurance company, by its agent, issued and delivered to the insured a "binder," or "binding slip," whereby it assumed and bound itself for $2,000 of insurance upon certain property of the insured, the "binding slip" to be void on the delivery of the policy. No rate of insurance was mentioned in the "binder," because the insured requested the agent to obtain from the company some concession, which the agent consented to do; and before the rate was agreed on, the property covered by the "binder" was destroyed by fire. The court held that a complete temporary contract of insurance ex-

isted between the insurer and the insured from the date of the delivery of the "binder," and the insured was bound to pay a reasonable rate of premium for the protection which he had received by the temporary contract.

While some of the earlier cases proceed on the theory that these "binding slips" or memoranda merely constitute agreements to issue policies, yet it is now universally held that these "binding slips," memoranda, or receipts have all the force and effect of insurance contracts, and are as binding as the policies themselves. The cases on this subject are collected by Mr. Cooley in his Briefs on the Law of Insurance (vol. 1, beginning on page 535). The case of *Todd* v. *German-American Insurance Co.,* supra, in principle fully controls the point now under discussion, and we conclude this branch of the case by the statement that in our opinion the trial judge very properly construed the writing in question as constituting a valid contract of insurance, and very properly refused to submit this question to the determination of the jury, it being the duty of the judge, and not of the jury, to decide whether the memorandum or "binder" constituted a valid contract of insurance.

It is contended by the plaintiff in error, in the next place, that the agent had no authority to make such a contract of insurance. There are three reasons shown by the evidence why this position is unsound: (1) The agent who made the binding memorandum or temporary contract was fully authorized by his written commission to take applications for insurance, and to countersign and issue policies, and the making by him of a temporary contract was clearly within the limits of his authority as agent. (2) The temporary contract was in accordance with his general custom as agent in connection with his agency; and (3) his act in making the temporary contract was fully approved and confirmed by the company. The company accepted the temporary contract and treated it as valid.

2.   The breaches of the terms and conditions of the contract of insurance relating to other insurance, incumbrances on the property, and failure to furnish proofs of loss within a reasonable time, were each claimed to have been waived by the company. These issues were solely questions of fact, to be decided by the jury, and there was both positive and circumstantial evidence in support of the waivers claimed by the plaintiff, and in denial of such waivers

by the defendant. The law applicable to these questions was fully submitted to the jury in the charge of the judge, in accordance with the repeated decisions of this court and the Supreme Court. *Insurance Company of North America* v. *DeLoach, 3 Ga. App.* 807 (61 S. E. 406); *American Insurance Co.* v. *Peebles, 5 Ga. App.* 731, 736 (64 S. E. 304); *Southern Fire Insurance Co.* v. *Knight,* 111 *Ga.* 622 (36 S. E. 821, 52 L. R. A. 70, 78 Am. St. R. 216), and cases there cited. We are clearly of the opinion that the verdict is fully supported by the evidence and the law applicable thereto. *Judgment affirmed.*

POWELL, J., concurring specially. I do not think that the so-called "binder" in this case, standing alone, would comply with our statute requiring all contracts of insurance to be in writing. It fails to show at least one essential element of a contract of insurance—the name of the person to be insured. But what was lacking in the "binder" was supplied by the daily report subsequently made out by the agent and accepted by the company. While a contract of insurance must be in writing, the writing need not be delivered to the insured. And under the principle announced in *Capital City Brick Co.* v. *Atlanta Ice & Coal Co.*, supra, though the contract may rest wholly or in part in parol, if it becomes evidenced by writing at any time before the suit is filed, the statute requiring the writing becomes satisfied.